The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.



/S/ RUSS KENDIG

Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 7 |
| TIMOTHY EDWIN GROSCOST, | CASE NO. 11-60502 |
| Debtor. | JUDGE RUSS KENDIG |
| | **MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)** |

The United States Trustee ("UST") moved to dismiss Debtor's case under 11 U.S.C. § 707(b)(3)(A),[1] contending the petition was filed in bad faith. Debtor disagreed. The motion was tried on August 23, 2011. The following Memorandum of Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. In rendering its decision, the Court has considered the testimony of witnesses and the exhibits admitted into evidence during the hearing.

Jurisdiction is premised in 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTS

On June 28, 2008, at the age of 50, Debtor voluntarily quit his thirty-two year employment with Kroger. He cited the institution of a new system, called Key Retail, as

---

[1] Although the UST's motion also references 11 U.S.C. § 707(b)(3)(B), the UST abandoned this argument and focused on the bad faith argument.

1

the catalyst for his exit. The Key Retail changes were stressful because Debtor believed they resulted in a deterioration of the store image, which led to his breaking point as head grocery clerk. Previous store managers had sufficient corporate power to skirt the issue, but those managers had moved on. Basically, he claimed fighting against Key Retail was a battle he knew he couldn't win and he quit.

At the time, he was a divorced homeowner with a mortgage and approximately $60,000.00 to $70,000.00 in credit card debt. He had a Kroger 401(k) savings plan, worth in the neighborhood of $53,000.00, and his retirement. His pension plan appears to be a defined benefit plan.

After he quit his job in June 2008, Debtor cashed out the Kroger savings plan, netting approximately $43,024.59. His intent was to live on this money until he could draw his pension at age 55. If money ran short, he said he would build picnic tables or do home remodelling.

He also believed that he would win the lottery. For the past seven years, he has played the same six numbers in the Classic Lotto. He spends $3.00 per week and is thoroughly convinced that he will win. On the day of the trial, he said he had checked the numbers before coming to court because he thought it would be a good day to win.

Following his exodus from Kroger, Debtor did not seek employment. He lived on the savings plan money and continued to use his credit cards. In 2008, he took a $15,000.00 cash advance to purchase a vehicle and a motorcycle. He also used a credit card check to install a new furnace and air-conditioning system in his home, at a cost of approximately $8,000.00.

For approximately two months in early 2009, Debtor went to California and lived on a friend's boat, which may qualify as a yacht. He insisted his expenses were less in California than if he'd remained in Ohio. There, he only paid for cable and his daily needs. His Ohio utility expenses were at the bare minimum and he continued to make his mortgage payment. While in California, Debtor took some day trips, including a trip to Tijuana. He said he did not live extravagantly and that much of his time was spent walking on the beach, taking in sunsets, and meeting interesting people. It was "play" in the sense that it was not structured or organized.

Debtor ran out of money far short of receiving his monthly pension benefit. He began experiencing financial problems in 2009. He maxed out his Discover card and Bank of America card in June 2009. He stopped paying his mortgage in approximately July 2009. Yet Debtor did not look for work. Instead, he continued to play the lottery and began selling personal items, including the truck and the motorcycle he had purchased with the cash advance. Debtor was, when credit was available, using one card to pay another. He admitted that his financial situation continued to deteriorate.

In July 2010, Debtor was "at the lake" and received a call that someone broke in to his house and was removing his property. The reality was that a writ of possession had issued following foreclosure of his home. On his return trip from the lake, he saw a billboard advertising his attorney's bankruptcy services, which ultimately led to this bankruptcy. In September 2010, he obtained work at CVS Pharmacy. He was hired by one of his former Kroger managers. He remains employed with CVS in a position that is far less attractive than the one at Kroger. He filed a bankruptcy case on February 23, 2011, owing over $100,000 in general unsecured debt with pitifully small non-exempt

2

assets.

## LAW AND ANALYSIS

Bankruptcy courts have authority to dismiss abusive cases for debtors with primarily consumer debts. 11 U.S.C. § 707(b)(1). The parties stipulated that the debts in this case are primarily consumer. (Doc. 24). Explaining the foundation of § 707(b) dismissals, the Sixth Circuit Court of Appeals stated:

> [Section] 707(b) allows a bankruptcy court to deal equitably with the unusual situation where an unscrupulous debtor seeks to enlist the court's assistance in a scheme to take unfair advantage of his creditors; it serves notice upon those tempted by unprincipled accumulation of consumer debt that they will be held to at least a rudimentary standard of fair play and honorable dealing.

In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989). Under 11 U.S.C. § 707(b)(3)(A), cases filed in bad faith are considered abusive and subject to dismissal. UST argues that Debtor filed this case in bad faith as evidenced by his "reckless" accumulation of debt and voluntary reduction of income, which Debtor denies.

Although various culminations of factors have been approved in reviewing for bad faith, there is no clearly articulated standard for a bad faith analysis because, as the Sixth Circuit noted, the 'facts required to mandate dismissal based on a lack of good faith are as varied as the number of cases.' Indus. Ins. Serv., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1127 (6th Cir. 1991) (citing In re Bingham, 68 B.R. 933, 935 (Bankr. M.D. Pa. 1987)) (other citations omitted).[2] "[G]ood faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation." Metro Emp. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah), 836 F.2d 1030, 1033 (6th Cir. 1988) (discussing good faith in a chapter 13 context). Consequently, each case must be reviewed on an "ad hoc" basis. Zick, 931 F.2d at 1129 (citing In re Brown, 88 B.R. 280, 284 (Bankr. D. Haw. 1988)). A case must pass the smell test to avoid dismissal. Merritt v. Franklin Bank, N.A. (In re Merritt), 211 F.3d 1269 (6th Cir. 2000) (citing Morgan Fiduciary, Ltd. v. Citizens & S. Int'l Bank, 95 B.R. 232 (S.D. Fla. 1988)).

A hallmark of good faith is the existence of an honest intention in filing bankruptcy. Tamecki v. Frank (In re Tamecki), 229 F.3d 205 (3rd. Cir. 2000) (citation omitted). Conversely, a lack of honesty can underpin bad faith. See, e.g., Krohn, 886 F.2d 123; In re Seeburger, 392 B.R. 735 (Bankr. N.D. Ohio 2008). Key considerations for divining a debtor's honesty include whether bad faith is evident in debtor's filings with the court, the existence of eve of bankruptcy purchases, and whether the filing was caused by "unforeseen or catastrophic events." Seeburger at 740 (citing Krohn, 886 F.2d at 126).

---

[2] As quoted in Zick, the bankruptcy judge's opinion stated "there is no cook book analysis that you can give. It really comes down to a sense of what is fair and just." Zick, 931 F.2d at 1126, fn. 1.

3

There is no palpable evidence of dishonesty in this case. There is no suggestion that Debtor lacked candor or has not been forthcoming. Debtor is not continuing a pattern of excess or lavishness. Debtor's filing, however, was not precipitated by calamity, but was caused by his poor judgment. Debtor engaged in a series of markedly poor decisions before this filing. However, in this regard, Debtor has the companionship of many debtors whose cases are not dismissed under bad faith. And the court cannot locate one case where a debtor's bad judgment, standing alone, warrants dismissal.

Many courts refer to a subjective review for § 707(b)(3) but this is most often in comparison to the standard employed under § 707(b)(2). *See, e.g.*, In re Stimmel, 440 B.R. 782 (Bankr. N.D. Ohio 2010); In re Lavin, 424 B.R. 558 (Bankr. M.D. Fla. 2010); In re Lorenca, 422 B.R. 665 (Bankr. N.D. Ill. 2010). Clearly, the latter, which focuses strictly on the means test, is an objective standard. In a previous decision, this court explored Sixth Circuit case law and determined that a bad faith review is not strictly limited to subjective considerations. In re Baum, 386 B.R. 649 (Bankr. N.D. Ohio 2008), Id. at 652-53 (citing Indus. Ins. Serv., Inc. v. Zick (In re Zick), 931 F.2d 1124, 1128 (6th Cir. 1991); In re Bingham, 68 B.R. 933 (Bankr. M.D. Pa. 1987)). The court pointed out that the list of factors outlined in Bingham encompassed both objective and subjective considerations and concluded a court is not relegated to an entirely subjective review. Baum, 386 B.R. at 653.

The court is convinced that, subjectively, Debtor did not file this case in bad faith. However, the court is equally convinced that Debtor was objectively unreasonable. Unquestionably, Debtor acted without due care when he quit his job, cashed in his 401(k) savings plan, and did not look for alternate work. It was unrealistic for him to expect the $43,000.00 savings to last four years until he became eligible for his pension benefit. Although it is not clear how much Debtor made while employed with Kroger, it was in excess of $10,000.00 per year. And, lottery odds being what they are, an expectation of a lottery win to save the day is unrealistic. After hearing his testimony, the court is convinced that Debtor honestly believed in the viability of his post-Kroger plan and honestly believed his most outrageous statements. If a § 707(b)(3) review requires objective reasonableness, the court cannot conclude this case was filed in good faith. The court must therefore determine which standard prevails: debtor's subjective standard or an objective reasonableness standard.

Neither Zick, the leading case on chapter § 707(b) bad faith in this circuit, or Bingham, the case upon which it relies, are particularly useful because they provide little direction. No congruence of facts exists between the cases. Additionally, the factors cited in Zick and Bingham are more easily measured than those in this case. For example, in Zick, the debtor was a former employee of IIS. Id. at 1125. He signed a no compete agreement upon leaving IIS, which he subsequently violated. Id. at 1125. Within two weeks of a $600,000 mediation award in favor of IIS, debtor filed bankruptcy. Id. at 1125-26. The court affirmed dismissal, concluding that the bankruptcy's findings that debtor had reduced his case down to a single creditor, IIS; failed to make any lifestyle changes; made no attempt to pay IIS; and filed nine days after the award were not an abuse of discretion. Id. at 1128. The unpure motivation was key to the dismissal.

Bingham, in turn, involved a debtor who had caused an accident while driving drunk. 68 B.R. 934. One of his victims died, another was injured. Id. at 934-35. Approximately one year after a lawsuit was filed against him, he filed bankruptcy, and a motion to dismiss was filed by one of the victims. Id. She argued that debtor had intentionally reduced his assets by disclaiming interests to which he was entitled during

4

his divorce and closing his business. Id. at 935-36. The court rejected both arguments, finding the debtor's motivation with the former was to provide for care of his children. Id. The court also found that dilapidation of the business premises was the catalyst for closing the business. Id. Additionally, debtor was responsible for a separate, sizeable unliquidated claim. Id. These factors all contributed to the bankruptcy filing and the court found debtor had filed in good faith, rejecting movant's claim of bad faith. Relying on the surrounding facts, the court refused to impute an anti-creditor motivation to debtor.

Cases in this circuit focusing exclusively on a debtor's subjectivity are not plentiful. One case of some utility is Alt v. U.S. (In re Alt), 305 F.3d 413, 418-19 (6th Cir. 2002). In Alt, the Sixth Circuit affirmed dismissal of a chapter 13 case, finding the case was filed in bad faith. Id. Prior to filing, the debtor received an IRS statement that showed she owed taxes in excess of the chapter 13 debt ceiling. She never brought this to her attorney's attention. After filing, she sat for a deposition. The bankruptcy court found her deposition testimony to be wholly incredible: '[s]he doesn't know her address, her phone number, where she lives, has never seen any checks being written.' Id. at 417. The Sixth Circuit also highlighted the unbelievable testimony and concluded that the bankruptcy court could consider whether the debtor was forthcoming. Id. Neither court believed the debtor. Unlike this case, it is clear that the courts found debtor to be both subjectively and objectively unreasonable, resulting in dismissal. That is only one half of the equation in this case.

A debtor's subjectivity is also referenced in In re Wallace, 2007 WL 3270765 (Bankr. E.D. Ky. 2007). The case bears some factual similarity to the present case.

> The court agrees with the U.S. Trustee that significant debts were incurred prior to the bankruptcy filing, and that the ability of the Debtors to ever repay all of those debts would have seemed very unlikely to a prudent person in their position. However, the following facts militate against a finding of abuse: Debtors have a history of mostly large income, Debtors refinanced their house and withdrew retirement savings to pay debt, and Debtors paid approximately $77,000.00 on revolving debt in 2006.

Id. at *2. Although the debtors' prepetition conduct was unreasonable, the unreasonableness was tempered by their attempts to pay the debt. Consequently, the court did not find bad faith in the bankruptcy filing. An assumption from this result is that, barring the attempts to pay, their unreasonableness in accruing the debt would not pass the smell test.

The debtor's intent was a key factor in this court's decision in Baum. There, the debtor incurred significant debt in a short period of time through online gambling. Regardless of her ability to pay, the court found she had an intent to repay her creditors. This, coupled with her "epiphany" about her gambling habit, led the court to find that she had not acted in bad faith in filing her bankruptcy. Although objectively the debtor could not have repaid the debt she incurred, her objective unreasonableness was mitigated by other factors.

The sum of the cited cases leads the court to conclude the following. First, there is no single litmus test for bad faith. Any amalgamation of facts can either demonstrate bad faith or exonerate a debtor from a bad faith finding. Second, the court does not solely

5

need to rely on a debtor's subjectivity in determining bad faith. It is but one consideration. Third, the cases suggest that courts weigh a debtor's subjective intent against other facts, including objective reasonableness. With these conclusions, and mindful that bad faith dismissals are reserved for "egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct or gross negligence," Zick, 931 F.2d at 1129, the court turns to the facts of this case.

In 2008, after thirty-two years of employment with Kroger, Debtor quit his job with no intention of finding alternate employment. He cashed out his 401(k) savings plan, an exempt asset, and determined to live on it the five years until retirement. It amounted to approximately $43,000.00, an amount that was clearly insufficient to allow Debtor to maintain an even minimal existence.

After terminating his employment, he continued to accumulate more credit card debt. Within months of quitting, he accumulated an additional $23,000.00 purchasing three items: a vehicle, a motorcycle and a furnace and air-conditioning system for his home. This is the bulk of the additional debt incurred after he left his job. As his financial situation worsened, he used credit, generally in the form of cash advances, to pay bills, including other credit cards.

One of the most disturbing facts in this case is Debtor's failure to seek employment in the face of his deteriorating financial condition. He admits he depleted his savings in approximately one year. He admits maxing out two cards in early summer 2009. He admits that he stopped paying his mortgage in July 2009. Yet he did not seek employment until more than one full year later. Meanwhile, he was still using his other credit cards. Clearly, there was no effort to repay the debt he had accumulated or to stem the accumulation of more debt during this period, nor was there any effort made to increase his income.

Debtor incurred at least one-third of the unsecured debt within two years of filing bankruptcy. In June 2008, when Debtor quit his job, he owed nothing on his Discover card. Just over two years later, when he filed his bankruptcy case, he owed over $14,000.00. The Bank of America statements show a similar pattern. The July 2008 statement shows no prior balance on the account. On July 1, 2008, he incurred $15,000.00 on the card by using a credit card check. Within one year, he had reached his maximum credit limit, missed a payment, and was incurring late fees and over the limit fees. When he filed bankruptcy, he owed Bank of America more than $16,000.00.

The pattern of irrational thought that permeated Debtor's behavior is troubling. In the worst employment market since the Great Depression, he left a job where he had been employed for thirty-two years, nearly five years shy of his eligibility for retirement under what appears to be a defined benefit plan. (341 Meeting Transcript 8:15-17). He cashed out an exempt 401(k) retirement fund. He inexplicably calculated that the $43,000.00 savings would last nearly four years, until he was entitled to draw his pension. In the off chance it did not, he put his faith in the Ohio Lottery Commission. He used a credit card to buy a car and a motorcycle. He used another card to purchase a new furnace and air-conditioning system for his house. As he depleted the savings, he headed to California to hang out on a boat for a couple of months in the sunshine. When he got back, he ran out of money. He sold things, including the car and motorcycle he purchased using credit. He maxed out two credit cards. He used one credit card to pay another. He could not

11-60502-rk    Doc 32    FILED 09/27/11    ENTERED 09/27/11 09:26:23    Page 6 of 8

make his mortgage payments. During this time, there is not one suggestion he was building picnic tables or remodelling houses, doing any other kind of odd jobs, or seeking employment. What is plainly evident is overt evasion of reality. Only when his belongings were sitting on the curb did he take action.

The court finds that this is one of the egregious cases that falls in the rubric of bad faith. The bankruptcy system is intended to benefit the honest but unfortunate debtor. Here, Debtor created his own misfortune. The gross indifference Debtor exhibited cannot be condoned. This is not a single instance of poor judgment, it is a pattern of persistently inexplicable judgment with the cumulative effect of willful blindness. While Debtor might not have been dishonest in the sense of inaccuracy or concealment, he was not dealing with creditors candidly. He was not even candid with himself. Rewarding him with a discharge would be an abuse of the bankruptcy system.

Additionally, Debtor has an opportunity for reorganization in the future. No one argues that a chapter 13 reorganization plan is an option for Debtor at the present time. He works at CVS and brings home approximately $1,500.00 per month. He cannot support a repayment plan. However, next year he is eligible for his Kroger pension, which will give him $1,800.00 in additional income. That amount, combined with his current earnings, would provide a basis for repayment of some of the debt he owes.

Debtor's insurmountable obstacle was the absence of any law indicating that the bad faith test is solely subjective. The court finds Debtor to be entirely credible, including matters which are confoundingly odd. These included quitting a stable, good paying job of thirty-two years nearly five years before retirement eligibility because he could not bear to see service quality decline; cashing in his largest exempt, accessible asset; believing that he would win the lottery; ignoring foreclosure until his personal property was sitting on the sidewalk; rationalizing multiple signs of impending financial ruin; and numerous other credibly incredible actions and inactions, not all of which have been set forth herein. He was utterly believable in his sincere belief in his poor choices.[3]

If the matter was solely subjective, Debtor would win. As outlined above, it is not.

## CONCLUSION

The court finds that allowing Debtor to discharge his debts would be an abuse of the bankruptcy process because debtor filed this case in bad faith. The UST's motion to dismiss under 11 U.S.C. § 707(b)(3)(A) will be granted and the case dismissed.

An appropriate order will be entered reflecting the decision of the Court.

# # #

---

[3] Debtor has not argued that he suffers from any mental illness. Compelling evidence of his poor judgment in non-financial matters was also presented. Debtor engaged in a protracted slugfest in a CVS store rather than turn over a cash drawer which contained limited funds. He continued to chase the thief outside the store after the robbery attempt was abandoned in the face of his "Men of Harlech" defense. Store policy is to hand over the money.

7

## SERVICE LIST

William C Fithian, III
111 N Main St
Mansfield, OH 44902

Dean Wyman
Office of the US Trustee
Howard M. Metzenbaum U.S. Court House
201 Superior Avenue, Suite 441
Cleveland, OH 44114-1240